IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

MERIAL LIMITED and          *
MERIAL SAS,
                            *
      Plaintiffs,
                            *
vs.                         CASE NO. 3:07-CV-125 (CDL)
                            *
CIPLA LIMITED,
                            *
      Defendant,
                            *
VELCERA, INC. and FIDOPHARM,
INC.,                       *

      Intervenors.          *

_____     *


                    O R D E R

      Plaintiffs Merial Limited and Merial SAS (collectively

"Merial") contend that Defendant Cipla Limited ("Cipla") violated

the Court's Order entered in this action on March 6, 2008 ("March

6, 2008 Order" or "2008 Order"), and that Intervenors Velcera,

Inc. ("Velcera") and FidoPharm, Inc. ("FidoPharm") (collectively

"Velcera") acted in concert with Cipla to violate that order.

Merial seeks contempt sanctions against both Cipla and Velcera.[1]

Cipla responded with a motion to vacate the Court's March 6, 2008

_____

[1] Merial initially filed a Motion for Contempt (ECF No. 24) against
Cipla, and then after Velcera intervened, Merial filed a Motion for
Order to Show Cause (ECF No. 30) against Velcera. The Court found
Merial's allegations sufficient to warrant an evidentiary hearing to
determine whether contempt sanctions should be imposed against Cipla
and/or Velcera. That hearing was held on May 16 and 17, 2011.

Order (ECF No. 33) claiming that it was void as to Cipla because Cipla was not subject to the personal jurisdiction of the Court at the time the Order was entered. In the alternative, Cipla argues that its conduct does not violate the 2008 Order. Velcera contends that it is not a party to the 2008 Order; that its conduct does not violate the Order; that if Cipla did not violate the Order, Velcera could not have acted in concert with Cipla to violate the Order; and even if Cipla violated the Order, Velcera did not act in concert with Cipla to violate the Order.

After an evidentiary hearing, written briefing, and oral argument by counsel, the Court finds that Cipla was subject to the jurisdiction of this Court in the action giving rise to Merial's contempt motion, that Cipla violated the Court's March 6, 2008 Order, and that Velcera acted in concert with Cipla in the violation of the Court's Order.[2] Accordingly, Cipla's

---

[2] The Court held an evidentiary hearing on May 16 and 17, 2011. At the conclusion of the hearing, the parties agreed that the evidentiary record was closed. The Court scheduled final oral argument for June 8, 2011 and requested that the parties, prior to final argument, submit proposed findings of fact and conclusions of law based upon the evidence admitted at the May 16-17 evidentiary hearing. Subsequent to the evidentiary hearing and even after final argument, the parties have not only sought to amend their proposed findings and conclusions but have sought to supplement the evidentiary record. The Court finds that the parties had a fair opportunity to present evidence at the May 16-17 evidentiary hearing, and if they did not believe they had an adequate opportunity at that time, they had an opportunity to file a motion to continue the evidentiary hearing prior to the final arguments on June 8, 2011. No such motions were filed. To allow continuing supplementation of the evidentiary record after the final arguments have been made and after the evidentiary record has been closed would eliminate finality and be unjust to parties who have no opportunity to respond to endless supplementation and counter-

motion to vacate the March 6, 2008 Order (ECF No. 33) is denied, and Merial's motions seeking contempt sanctions (ECF Nos. 24 & 30) are granted to the extent described in this Order. The Court's rulings are based upon the following Findings of Fact and Conclusions of Law.[3]

---

supplementation. Accordingly, the Court denies the pending motions for leave to file supplemental findings of fact and conclusions of law (ECF Nos. 60, 61, 62 & 72).

[3] Preliminarily, the Court addresses two issues raised tangentially in these proceedings. First, Velcera has filed a declaratory judgment action in Delaware seeking a declaration that Merial's '329 patent, which is the subject of this Court's March 6, 2008 Order, is invalid. Velcera maintains that the present action should be stayed pending a determination of the validity of the patent in the Delaware action. The Court finds that this action should not be stayed and specifically holds that the "first-to-file rule" and principles of comity do not support a stay. The Court notes that the present action was in fact the first one filed. Moreover, while both actions share some issues and parties, the precise issues to be resolved in this action are different from those in the Delaware action, and one of the central parties in this action is not a party to that action.

Second, counsel for Velcera and Cipla have commented that the expedited nature of these proceedings has been unusual and presented challenges. To the extent that any party raises this issue on appeal, the Court finds it appropriate to make the following observations. When Merial first filed its contempt-related motions, it sought expedited review based on its contention that without immediate judicial intervention it faced irreparable injury. Consequently, the Court, consistent with its standard practice, scheduled an expedited hearing. At the hearing, the issue arose as to whether the Court's ruling would be in the nature of a preliminary injunction that would maintain the status quo until the matter was finally decided on the merits, or whether the Court had sufficient evidence after the hearing to decide the matter finally on the merits. At the close of the evidentiary hearing, the Court sought input from the parties as to which alternative they preferred. Merial stated that it preferred treating the matter as one seeking preliminary injunctive relief, while Cipla and Velcera informed the Court that they preferred for the Court to make a final ruling on the merits. The Court found Cipla's and Velcera's position to be sound, and determined that the evidentiary hearing, briefing, and thorough argument provided a sufficient basis for deciding the matter on the merits with a final order.

FINDINGS OF FACT

I.   **The Allegations in the Original Action and Default Judgment**

1.

In the action giving rise to the Court's March 6, 2008 Order, Merial alleged that Cipla sold in the United States two veterinary products designed to treat dogs and cats for fleas and ticks, and that these two products, "CIPLA PROTEKTOR" and "CIPLA PROTEKTOR PLUS," infringed two of Merial's patents—United States Patent No. 5,232,940 ("'940 Patent"), of which Merial was the exclusive licensee, and United States Patent No. 6,096,329 ("'329 Patent"), assigned to Merial.

2.

The '940 Patent included claims for a pesticide product that eliminated fleas and ticks on dogs and cats using a chemical formulation containing the active ingredient fipronil. Using the '940 Patent, Merial developed a product called "Frontline." The '940 Patent has since expired, and Merial does not rely upon it in support of its contempt motions.

3.

The '329 Patent included claims for a pesticide product that eliminated fleas and ticks on dogs and cats using a chemical formulation consisting of two active ingredients, fipronil and methoprene, and inactive ingredients that served as an adjuvant for the effective delivery of the active

ingredients. Using the '329 Patent formulation, Merial developed a financially successful product known as "Frontline Plus."

4.

In the original Complaint in this action, Merial alleged that CIPLA PROTEKTOR infringed at least one claim of the '940 Patent and CIPLA PROTEKTOR PLUS infringed at least one claim of the '329 Patent. Merial sought a judgment that Cipla infringed the '940 and '329 Patents and requested injunctive relief to prevent Cipla from selling or causing to be sold in the United States products that infringed the '940 Patent and the '329 Patent.

5.

Cipla failed to respond to Plaintiffs' Complaint, and the Court made an entry of default on March 6, 2008. In that Order, the Court found in relevant part that the '940 Patent and the '329 Patent were valid and enforceable. Order ¶ a, Mar. 6, 2008, ECF No. 18. The Court concluded that Cipla, having made and sold in the United States veterinary products containing the active ingredients fipronil and methoprene and containing inactive ingredients that served as an adjuvant for effective delivery of the active ingredients, infringed at least one claim of the '329 Patent. *Id.* ¶ c. The Court also found that Cipla, having made and sold in the United States veterinary products

that contain fipronil, infringed at least one claim of the '940
Patent. *Id.* ¶ b. Based on the Court's findings of
infringement, the Court ordered the following injunctive relief:

> [Cipla], as well as those persons and entities in
> active concert with [Cipla] who have notice of this
> order, are herewith permanently enjoined from
> committing any act that infringes or causes or induces
> infringement of any claim of the '940 or '329 patents,
> including but not limited to making, having made,
> using, causing to be used, selling, causing to be
> sold, offering for sale, and causing to be offered for
> sale in the United States, and importing and causing
> to be imported into the United States, any product
> that infringes any claim of the '940 or '329 patents,
> including but not limited to the veterinary products
> denominated CIPLA PROTEKTOR that contain fipronil and
> the veterinary products denominated CIPLA PROTEKTOR
> PLUS that contain fipronil and methoprene[.]

*Id.* ¶ e. The Court subsequently entered a default judgment
against Cipla.

## II. Jurisdictional Facts[4]

6.

At the time that this patent action was filed and served on
Cipla, Cipla manufactured the alleged infringing products CIPLA

---

[4] Cipla seeks to avoid the consequences of the default judgment by
having the default judgment vacated based upon a lack of personal
jurisdiction. Since some of the facts on which jurisdiction are based
are contested, the Court must make findings of fact related to the
exercise of personal jurisdiction over Cipla. The Court notes that at
the time Merial filed its original complaint in this action, it relied
upon the Georgia long-arm statute as the basis for personal
jurisdiction over Cipla; however, during the pendency of the present
proceedings, Cipla has denied any contacts with the State of Georgia.
Since no discovery has been conducted to test Cipla's denial and based
on evidence that Cipla has consistently denied significant contacts
with any state, Merial now shifts its jurisdictional focus to Fed. R.
Civ. P. 4(k)(2).

PROTEKTOR and CIPLA PROTECKTOR PLUS in India. Cipla is an Indian corporation with its principal place of business in Mumbai, India.

7.

CIPLA PROTEKTOR was designed to be a generic formulation of Merial's Frontline product. CIPLA PROTEKTOR PLUS was designed to be a generic version of Merial's Frontline Plus product, containing the same chemical formulation. As established in the Court's March 6, 2008 Order, these products infringed the '940 and '329 Patents, respectively.

8.

Cipla's PROTEKTOR products are offered for sale through internet retailers, including www.Petmedsrus.com ("Petmedsrus"). The Petmedsrus website lists Cipla as the manufacturer of the product "PROTEKTOR Spot On" and acknowledges that it sources its products from Indian companies. Notwithstanding this circumstantial evidence, Merial points to no direct evidence showing how Petmedsrus got the PROTEKTOR products or whether any agreement or relationship existed between Cipla and Petmedsrus for the sale of the PROTEKTOR products.

9.

CIPLA PROTEKTOR Spot On was available for purchase over the internet in the United States through Petmedsrus and was sold via the internet in the United States and in the State of

Georgia. CIPLA PROTEKTOR Spot On was delivered in the State of Georgia.  Petmedsrus offered PROTEKTOR Spot On for sale as a generic form of Frontline Plus.

10.

Merial has its principal place of business for the United States in the State of Georgia.

11.

Cipla, a foreign entity, transacted substantial business across the United States.  It exported a substantial percentage of its products to the United States, applied for numerous patents and filed documents with the United States Environmental Protection Agency ("EPA") and the United States Food and Drug Administration ("FDA").

12.

Although it denies any meaningful contacts with the State of Georgia, Cipla contends that it would have been subject to the jurisdiction of courts in Illinois for the claims raised in the present action.  The Court rejects that contention based on the following factual findings.  Although Cipla made three shipments of some type of product to Illinois prior to the entry of the Court's default judgment, those shipments were all made after this action was filed.  Cipla pointed the Court to no evidence of any shipments to Illinois prior to, or at the time this action was filed.  Although evidence exists that Cipla had

a relationship with Watson Laboratories, Inc., an entity located in Illinois, prior to the filing of the action, there is no evidence regarding the details of Cipla's relationship with Watson relating to the state of Illinois prior to the filing of this action. Furthermore, Cipla's newfound position that it would have been subject to jurisdiction in Illinois is inconsistent with previous positions it has taken in this litigation and in litigation in Illinois. Throughout this litigation, Cipla has maintained that it is not subject to jurisdiction in the United States and has minimal, if any, contacts with the United States, including Illinois. Shortly after Cipla fell into default in this action, Cipla's counsel wrote the Court a letter denying a presence in the United States. Letter from R. Green, Counsel for Cipla, to the Court, Apr. 14, 2008, ECF No. 20. Cipla has also represented to the Court in its briefing that: "Cipla is incorporated and has its principal place of business in India, and, in fact, all of its offices are located there. Cipla is not licensed to do business in the United States. In fact Cipla has no agent for service of process in the United States. Cipla does not maintain any offices, facilities, employees, equipment, inventory, or records in the United States." Def. Cipla Ltd.'s Mem. of Law in Supp. of its Mot. to Vacate the Default J. 3, ECF No. 33-1 (citations omitted). To further refute Cipla's position that it would have

been subject to personal jurisdiction in Illinois, the Court relies on pleadings filed in an action in Illinois in which Cipla expressly denied that it had sufficient connection to the state of Illinois for personal jurisdiction purposes, even though in that action it voluntarily consented to submit to jurisdiction. Pl.'s Tr. Ex. 104, Defs.' Am. Answer, Affirmative Defenses and Countercls. to Pl.'s Am. Compl. for Patent Infringement ¶ 11, Connetics Corp. v. Pentech Pharms., Inc., Civil Action No. 1:07-CV-06297, ECF No. 116 (N.D. Ill.). Finally, the Court finds that Cipla has boasted in its own documents that it has structured relationships with other entities for the express purpose of attempting to avoid the application of the United States' patent laws to its conduct. Pl.'s Tr. Ex. 77, Cipla's Fin. Profile 1 ("The future will see more litigations on this major issue that will, unfortunately, also extend to India in due course. However, your Company's approach in forming strategic alliances and partnerships in all overseas markets has protected the Company from the high cost of patent litigation."). The Court finds that all of the foregoing evidence outweighs the conclusory declaration of Dr. Mehta filed on behalf of Cipla prior to the final hearing. Def. Cipla's Reply in Supp. of its Mot. to Vacate for Lack of Personal Jurisdiction Attach. 1, Mehta Decl., ECF No. 49-1. In that declaration, Dr. Mehta claims that Cipla would have consented to

personal jurisdiction in Illinois if it had been sued in the Northern District of Illinois in October 2007 or in 2008. Dr. Mehta also states in her declaration that Cipla made systematic shipments to Watson Laboratories in Illinois during this time frame. As previously explained, this declaration is inconsistent with the position Cipla has taken in pleadings in an Illinois action where it voluntarily submitted to jurisdiction but denied continuous and systematic contacts with Illinois. Moreover, the declaration contains no specific evidence as to the nature of the contacts so that the Court can evaluate whether they were sufficiently systematic to warrant the exercise of personal jurisdiction under Illinois law.[5]

13.

Based on the foregoing, the Court finds: (1) due to its limited transaction of business in Georgia as indicated by the present record, it is doubtful that Cipla is subject to the jurisdiction of the Georgia courts under the Georgia long-arm

---

[5] The Court notes that Dr. Mehta attended the final hearing in the present action, and no request was made at that time or prior to the close of the record that she be allowed to supplement her declaration with testimony about specific facts supporting her conclusion that systematic contacts existed with the State of Illinois. It was only after the final hearing had been concluded and the record closed that Cipla sought to supplement the record. The Court rejects any suggestion by Cipla that it did not have time to provide adequate facts supporting jurisdiction in Illinois. It clearly knew of Merial's Rule 4(k)(2) position at the evidentiary hearing on May 16, and it made no attempt to provide any additional supplementation during the approximately three week period between the evidentiary hearing and the final arguments on June 8.

statute; (2) no other court of general jurisdiction in any other state, including the State of Illinois, would be authorized to exercise personal jurisdiction over Cipla for the claims arising in this action; and (3) Cipla does have sufficient contacts with the United States such that the exercise of jurisdiction over it in Georgia for the claims asserted in this action would not offend the Constitution or laws of the United States.

## III. The Cipla/Velcera Venture

14.

Merial's Frontline Plus product is the leading veterinary pesticide product in the United States. Due to its unique active ingredient formulation, consisting of fipronil and methoprene, Frontline Plus offers dog and cat owners an effective and safe "spot on" treatment for the elimination of fleas and ticks.[6]

15.

The potential market in the United States for a generic spot on fipronil/methoprene combination pet pesticide is financially seductive. Cipla attempted to enter it but was temporarily deterred by the patent infringement action giving rise to the Court's March 6, 2008 Order. Velcera, along with

---

[6] "Spot on" refers to the method of application which allows the pet owner to dispense the liquid product to the area around the nape of the neck of the pet, where the solution is effectively absorbed through the skin into the bloodstream.

Cipla, designed a strategy to enter that potentially lucrative market. That strategy required Velcera to navigate numerous obstacles, a process Velcera's chief executive officer described as "threading a needle." The primary obstacle, as highlighted by the present litigation, was to obtain regulatory approval from the EPA for a generic product that was substantially similar and/or identical to Merial's Frontline Plus while not infringing Merial's patents for the Frontline Plus product. Merial had two patents related to its Frontline Plus product. The '329 Patent, the one directly involved in this litigation, included in relevant part claims related to the formulation of the two active ingredients, fipronil and methoprene. Another Merial patent, which the parties refer to as the '229 Patent, involved the formulation of the inactive ingredients. In addition to the patents, the Court's March 6, 2008 injunction Order made it clear that neither Cipla nor anyone in concert with Cipla could sell in the United States or cause to be sold in the United States any product that infringed the '329 Patent.

16.

Both Cipla and Velcera were aware of these obstacles, and both were aware of this Court's March 6, 2008 Order. Undeterred and encouraged by the prospect of significant profits from a generic spot on fipronil/methoprene product, Velcera through its wholly owned subsidiary, FidoPharm, set out to "thread the

needle." FidoPharm began development of a product that would later be marketed as PetArmor Plus, through its relationship with a consulting company known as OmniPharm—which formed joint ventures with Cipla to sell the product to FidoPharm. Although FidoPharm had the proprietary rights to the product, it used Cipla's laboratory facilities in India to formulate and test the product. LoradoChem—a wholly owned FidoPharm subsidiary—included data from the tests performed by Cipla in its submissions to the EPA. FidoPharm also used Cipla to manufacture and package the final product for distribution to the United States. Cipla's EPA establishment number—identifying Cipla as the final producer of the product—is included on the back of the PetArmor Plus package. Without that EPA establishment number, the product could not have been sold legally in the United States.

17.

In its application to the EPA, LoradoChem successfully convinced the EPA that PetArmor Plus was substantially similar and/or identical to Frontline Plus.[7] The PetArmor Plus EPA registration included Cipla's establishment number, which is required for any product registration with the EPA. The EPA

---

[7] This process is known as the "me too" process that allows a prospective pharmaceutical registrant to tag along with the previous approval of a "pioneer" product and have a generic product approved in an expedited fashion if it is determined to be substantially similar and/or identical to the previously approved pioneer product.

gave regulatory approval to the product. Thus, Velcera had effectively threaded this part of the needle.

18.

Velcera's next challenge was to avoid any patent infringement issues. It recognized the validity of Merial's '229 Patent regarding the inactive ingredients. Therefore, it was faced with developing a formulation for the inactive ingredients that did not infringe the Merial patent but that was still equally as efficacious as Frontline Plus in delivering the active ingredients without side effects for the pet. Velcera developed this formulation, using in part the Cipla laboratories in India. Thus, Velcera thought it had successfully threaded the next part of the needle.

19.

The next obstacle, which appears to have been looming over the entire process, was Merial's '329 Patent. Velcera could not find a way to develop a formulation for the active ingredient combination of fipronil and methoprene without infringing at least one claim of the Merial '329 Patent. Unable to complete its threading of the proverbial needle, Velcera abandoned any further attempt to proceed delicately in a careful manner but instead charged ahead, consciously ignoring the '329 Patent. Velcera took the subjective position that the '329 Patent was

not valid, and therefore, it could simply ignore the '329 Patent, which it did.

20.

The final obstacle was devising a set of relationships and arrangements to use Cipla as its manufacturer and final producer without running afoul of the Court's March 6, 2008 Order. Notwithstanding the multiple layers of arrangements that were constructed to get the product to the United States, the substance of the various transactions is clear. Cipla played the critical and essential roles of manufacturing, packaging, and assisting in the development of the PetArmor Plus product for Velcera to sell in the United States. Cipla knew the product was to be sold in the United States, even though the product traveled from its facility in final consumer-ready condition through various other layers before it actually ended up on U.S. soil.

21.

Both Cipla and Velcera knew at the time that the PetArmor Plus product infringed the '329 Patent. Notwithstanding the Court's March 6, 2008 Order, of which both Cipla and Velcera were aware, Velcera sold the product in the United States, touting it as the same as Frontline Plus but cheaper.

16

## IV. Infringement of Merial's '329 Patent and Violation of the Court's Order

### 22.

Velcera acknowledges that PetArmor Plus infringes at least one claim of Merial's '329 Patent, and Cipla makes no credible argument to the contrary. The evidence supports no other conclusion. The fipronil/methoprene active ingredient formulation is essentially identical in the two products. PetArmor Plus also contains a customary spot-on formulation adjuvant. In its application for regulatory approval, Velcera described PetArmor Plus as substantially similar and identical to Merial's Frontline Plus. Velcera's marketing strategy is based on persuading the consumer that PetArmor Plus is the same as Frontline Plus, except it is cheaper. They are the same.

### 23.

The Court also finds persuasive the expert testimony given at the evidentiary hearing that there are not more than colorable differences between PetArmor Plus and the infringing product described in the Court's March 6, 2008 Order. The 2008 Order found the infringing product to be one that violated the '329 Patent. The claims of the patent require: (1) synergistic effective amounts of fipronil; (2) synergistic amount of a

compound which mimics juvenile hormones (*e.g.*, methoprene); and (3) at least one customary spot-on formulation adjuvant. The specific Cipla product mentioned in the Court's Order, PROTEKTOR PLUS, contained 9.7 % fipronil liquid and 11.8 % methoprene. The percentages admittedly, by virtue of the default, existed in the product in "synergistic amounts." Moreover, PROTEKTOR PLUS necessarily—by virtue of the default—contained "at least one customary spot-on formulation adjuvant." Based on the admitted allegations in the Complaint due to Cipla's default and the expert testimony presented by Merial at the evidentiary hearing, the Court finds that it is clear that not more than colorable differences exist between the PetArmor Plus product and Cipla's product that the Court found in its March 6, 2008 Order violated the '329 Patent.

24.

In summary, the Velcera PetArmor Plus product, which is manufactured and packaged for sale in the United States by Cipla, is not more than colorably different from the product that the Court found in its March 6, 2008 Order violated Merial's '329 Patent. That patent was valid at the time of the infringement and remains valid today. It is delusional to suggest that no infringement occurred because the infringer held the subjective opinion that the patent was not valid. Cipla, through its conduct in the development, manufacture, and sale of

the PetArmor Plus product, has clearly infringed and/or caused to be infringed Merial's '329 Patent. This Court's March 6, 2008 Order clearly and unequivocally prohibited Cipla from engaging in such conduct. In fact, the purpose of the Order was to prevent the very conduct engaged in here by Cipla. Clever lawyers cannot shield the true substance of the contumacious conduct, no matter how many different entities attempt to launder Cipla's fingerprints off the product.

25.

Cipla did not act alone in violating the Court's Order. It needed someone to aid and abet it—someone who could facilitate the sale of the product in the United States. Cipla surely knew that it could not sell the product directly into the United States given its previous unsuccessful attempt to do so and the Court's Order prohibiting it from doing so. Velcera, perhaps blinded by potential riches, was the ideal partner—it was willing to bet its entire existence on its subjective conclusion that a patent it knowingly intended to violate was invalid. Velcera's willingness to be the front man was essential to the success of the product launch, and the '329 Patent would not have been infringed absent Velcera's contributory conduct. Velcera and Cipla acted in concert to bring a product to the United States that each knew infringed Merial's patent and consequently knew violated the Court's Order.

CONCLUSIONS OF LAW

1.

The law of the Federal Circuit shall apply to the substantive patent issues presented by Merial's contempt motion. *See Midwest Inds., Inc v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999) (noting the Federal Circuit "appl[ies] our own law with respect to patent law issues"). The Federal Circuit reviews procedural matters not unique to patent issues under the law of the regional circuit where appeals from the district court normally lie. *E.g.*, *Ashland Oil, Inc. v. Delta Oil Prods. Corp.*, 806 F.2d 1031, 1033 (Fed. Cir. 1986).

2.

Merial has the burden of proving by clear and convincing evidence that Cipla violated the Court's March 6, 2008 Order and that Velcera acted in concert with Cipla in the violation of the Order. *Int'l Rectifier Corp. v. Samsung Elecs. Co.,* 361 F.3d 1355, 1359 (Fed. Cir. 2004). However, "[a] defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established." *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (internal quotation marks omitted). "A

default judgment is unassailable on the merits, but only so far as it is supported by well-pleaded allegations." *Id.* (internal quotation marks omitted). Accordingly, Cipla, by virtue of its default, admits the well-pleaded allegations in the Complaint, and to the extent that they support the non-jurisdictional merits of Merial's contempt motion, no further evidence of those factual allegations is necessary.

3.

Regarding Cipla's motion to vacate the Court's Order due to lack of personal jurisdiction, Merial also has the burden of proving personal jurisdiction. The facts alleged in the defaulted complaint are not admitted for purposes of determining jurisdiction. *See Iowa State Univ. Research Found., Inc. v. Greater Continents Inc.*, 81 F. App'x 344, 349 (Fed. Cir. 2003) (citing Eighth Circuit rule placing burden of proof on Plaintiff where defendant challenged personal jurisdiction in motion to set aside entry of default judgment); *see also Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico*, 563 F.3d 1285, 1294 (Fed. Cir. 2009) (noting general rule that "the plaintiff bears the burden of proof as to whether the defendant is subject to personal jurisdiction."); *accord Oldfield v. Pueblo de Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009) ("It goes without saying that, where the defendant challenges the court's exercise of jurisdiction over its person, the plaintiff bears

the ultimate burden of establishing that personal jurisdiction is present."). The law of the Federal Circuit, rather than the law of the Eleventh Circuit, applies to determine whether personal jurisdiction can be exercised over an out-of-state infringer. *Akro Corp. v. Luker,* 45 F.3d 1541, 1543 (Fed. Cir. 1995).

4.

An intervenor is required to accept the case in the posture in which it found it. *See Knowles v. Bd. of Pub. Instruction of Leon County, Fla.*, 405 F.2d 1206, 1207 (5th Cir. 1969) (per curiam).[8] Therefore, Velcera cannot contest the facts previously established in this action prior to its intervention. The fact that Cipla did not contest infringement or the validity of Merial's patent in the underlying action does not make a contempt proceeding inappropriate here. *See Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1350 (Fed. Cir. 1998) [hereinafter *Additive Controls II*] (rejecting non-party's argument that contempt proceedings were inappropriate because the defendant in the original proceeding did not contest infringement of the original device or validity of the patent). "The judgment against [the defendant]. . . establishe[s] for the purposes of this

---

[8] The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. *Bonner v. City of Prichar*d, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

litigation that [the plaintiff's] patent was valid and that the [defendant's product] infringed the patent." *Id.* "In a contempt proceeding to enforce the injunction entered as a part of that judgment, the only available defense for anyone bound by the injunction was that [its modified product] did not infringe or that it was more than a colorable variation of the [original product]." *Id.* Validity of the patent and infringement of the original product are not open to challenge in the contempt proceedings. *Id.*

## I. Jurisdiction

### 5.

Cipla argues that it cannot be found to be in contempt of the Court's March 6, 2008 Order because it was not subject to the personal jurisdiction of the Court when the Order was entered. Therefore, it maintains that the Order is void as to it and has no legal effect. Velcera joins in Cipla's argument, contending that if Cipla did not violate the Court's Order, then Velcera certainly could not have acted in concert with and/or aided and abetted Cipla in the violation of the Order.

Plaintiffs originally maintained that personal jurisdiction existed over Cipla in the defaulted action pursuant to Georgia's long-arm statute. However, upon learning of Cipla's position that it has limited contacts with the United States, specifically including the State of Georgia, Plaintiffs now

maintain that Cipla was subject to the personal jurisdiction of this Court under Federal Rule of Civil Procedure 4(k)(2).[9]  Under Rule 4(k)(2):

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2).  "Thus, for a court to exercise personal jurisdiction over a defendant under that rule, the plaintiff's claim must arise under federal law, the defendant must not be subject to jurisdiction in any state's court of general jurisdiction, and exercise of jurisdiction must comport with due process."  *Touchcom, Inc. v. Bereskin & Parr,* 574 F.3d 1403, 1412 (Fed. Cir. 2009).

6.

Merial's Complaint against Cipla for patent infringement arises under federal law—the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

---

[9] The Court agrees that the present record does not support a finding that Cipla had sufficient contacts with the state of Georgia for it to be subject to personal jurisdiction under the Georgia long-arm statute for the present action.  Accordingly, it is appropriate to determine whether general federal long-arm jurisdiction applies pursuant to Fed. R. Civ. P. 4(k)(2).  *See Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1415 n.5 (Fed. Cir. 2009) ("Because [the plaintiff] argued both [R]ule 4(k)(1)(A) and Rule 4(k)(2), and because we have dealt with both of those rules, we need not decide whether a Rule 4(k)(2) analysis can only be conducted after a 4(k)(1)(A) analysis.").

Under the second requirement of Rule 4(k)(2), a defendant may "avoid the application of [Rule 4(k)(2)] only when it designates a suitable forum in which the plaintiff could have brought suit." *Touchcom, Inc.,* 574 F.3d at 1415. Cipla did not designate a suitable forum in which it could have been sued prior to default judgment being entered against it. Moreover, it did not designate a suitable substitute forum when it first filed its motion to vacate the default judgment due to lack of personal jurisdiction. Cipla first designated the state of Illinois as a suitable substitute forum in its reply brief on its motion to vacate after Merial raised Rule 4(k)(2) as a basis for personal jurisdiction for the first time in its response to Cipla's motion to vacate.

Cipla maintains that this action could have been brought in the state of Illinois, where general jurisdiction existed under Illinois law. Under the Illinois long-arm statute, general jurisdiction can be exercised over "a corporation doing business within" Illinois. 735 Ill. Comp. Stat. 5/2-209(b)(4). The "'doing business' standard is very high and requires the nonresident corporation's business activity in Illinois to be carried on, not casually or occasionally, but with a fair measure of permanence and continuity." *Morgan, Lewis & Bockius,*

*LLP*, *v. City of E. Chicago*, 401 Ill. App. 3d 947, 953 (2010).
The "requirement means that in effect, the foreign corporation
has taken up residence in Illinois and, therefore, may be sued
on causes of action both related and unrelated to its activities
in Illinois." *Id.* (internal quotation marks omitted). There
is no exact test to determine whether a corporation is doing
business in Illinois, but most "Illinois cases determining the
existence of personal jurisdiction over foreign corporations
have based their findings upon the existence of factors such as
offices or sales activities in Illinois." *Id.* (internal
quotation marks omitted).

Cipla argues that general personal jurisdiction could have
been exercised over it in Illinois under Illinois law and that
it now consents to submit to jurisdiction in Illinois. The
Court finds that Cipla's "after the fact" willingness to consent
to jurisdiction in Illinois so that it may vacate a previously
entered default judgment is not sufficient to support a finding
that it could have been sued in another state and thus avoid
Rule 4(k)(2) jurisdiction. Instead, the Court finds that Rule
4(k)(2) requires a determination of whether an Illinois court
could have exercised general jurisdiction over Cipla at the time
the Complaint in this action was filed absent consent to
jurisdiction by Cipla.

Cipla's reliance upon *Touchcom, Inc.* in support of its contention that it simply may consent today to a transfer of this action to Illinois and avoid Rule 4(k)(2) jurisdiction is misplaced. The Federal Circuit in *Touchcom, Inc.* did not hold that a defendant's consent alone to jurisdiction in a specific state, regardless of the circumstances, was sufficient to avoid Rule 4(k)(2) jurisdiction. The court did not have to reach that issue in its holding because the defendant in *Touchcom, Inc.* had not designated a state where jurisdiction would be appropriate. The Court narrowly held that a defendant had that burden, and if the defendant failed to designate such a state, then the plaintiff asserting Rule 4(k)(2) jurisdiction would be deemed to have satisfied its burden of demonstrating that no other state had general jurisdiction over the defendant. The Court did not hold that a defendant could avoid personal jurisdiction for default purposes by simply stating after the fact that it would now consent to jurisdiction in a particular state to avoid the default.

Allowing a defendant to avoid the consequences of a default after the fact simply by professing that it will now consent to jurisdiction if the default is lifted creates an opportunity for mischief and manipulation of the courts. For example, in this case, it is clear that Cipla would not have consented to jurisdiction in Illinois for the claims asserted in the present

action at the time the action was filed.  After it was placed in default in this action, Cipla denied any contacts with the United States and never mentioned the State of Illinois as a place where jurisdiction would be appropriate.  Moreover, in its motion to vacate the default, Cipla certainly suggested that its ties with the United States were so limited that no state would have jurisdiction over the claims in this action.  Furthermore, in its litigation in other matters in Illinois, Cipla has selectively consented to jurisdiction while never admitting that its contacts were sufficient to sustain jurisdiction without its consent.  Similar facts and circumstances were not present in *Touchcom, Inc.,* nor were they necessary to the court's holding there, as previously explained.

The Court finds that the proper inquiry in a case where a defendant seeks to avoid a default judgment due to lack of personal jurisdiction by designating a forum where it is subject to jurisdiction pursuant to Rule 4(k)(2) is to determine whether the defaulted action could have been brought in that designated forum in the first place under that forum's long-arm jurisdiction.  In this case, the Court finds that personal jurisdiction would not have existed under Illinois law for the claims asserted in this action against Cipla.  Cipla's only contacts with Illinois were three shipments of goods during the time frame surrounding the filing of the Complaint.  Cipla

pointed to no evidence regarding the quantity of the shipments or the revenue or sales generated by the shipments. Cipla has repeatedly maintained that it has no offices, inventory, or records in the United States, including Illinois. It also has consistently denied that it is licensed to do business in any state, including Illinois. Although Cipla asserts that it has a relationship with another corporation located in Illinois, the evidence provides no details regarding the extent of the contacts in Illinois resulting from that relationship at the time the action was filed. The Court finds that three shipments to Illinois and an undefined relationship with another entity located in Illinois does not demonstrate that Cipla is "doing business" in Illinois. For the same reasons, the Court concludes that jurisdiction does not exist under Section 2-209(c) of the Illinois long-arm statute, which provides that an Illinois Court "may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 Ill. Comp. Stat. 5/2-209(c); s*ee Bolger v. Nautica Int'l, Inc.*, 369 Ill. App. 3d 947, 951 (2007) (noting that "Illinois limits general jurisdiction over nonresidents to instances in which the nonresident was present and doing business in the forum" and applying the same "doing business test" applied under Section 2-209(b)(4)). The Court finds that Plaintiffs have carried

their burden of demonstrating that Cipla would not have been subject to personal jurisdiction in November 2007 in Illinois under Illinois law. Accordingly, the Court finds that Cipla was not subject to any state's courts of general jurisdiction under Rule 4(k)(2).

8.

To determine whether due process has been met under Rule 4(k)(2), the Rule "contemplates a defendant's contacts with the entire United States, as opposed to the state in which the district court sits." *Touchcom, Inc.,* 574 F.3d at 1416 (internal quotation marks omitted). "To be subject to general jurisdiction, a defendant business entity must maintain 'continuous and systematic general business contacts' with the forum, even when the cause of action has no relation to those contacts." *Synthes (U.S.A.),* 563 F.3d at 1297.

The evidence presented demonstrates that Cipla transacted substantial business in the United States and voluntarily engaged in commercial activity that would place it on notice that it may be haled into court here. Cipla had substantial exports into the United States, registered numerous patents with the United States Patent Office, and made EPA and FDA filings, so that Cipla had continuous and systematic contacts in the United States. Cipla does not strongly contest this conclusion.

9.

30

Once the Court finds a defendant's activities establish minimum contacts, the Court must determine whether the exercise of jurisdiction is reasonable and fair. *Id.* at 1299. The test of unreasonableness is a multi-factored balancing test evaluating "(1) the burden on the defendant, (2) the forum's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies, and (5) the shared interest of the states in furthering fundamental substantive social policies." *Id.*

The United States "has an interest in discouraging injuries that occur within its boundaries, including injuries resulting from patent infringement." *Id.* The United States also has an interest in enforcing federal patent laws. *Id.* Further, the "'progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome.'" *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980)).

The exercise of jurisdiction in this case is particularly compelling because Cipla has taken advantage of lucrative business opportunities in the United States while purposefully attempting to structure the form of its relationships in a manner to avoid jurisdiction here and evade compliance with

certain United States patent laws. Pl.'s Tr. Ex. 77, Cipla's
Fin. Profile 1 ("The future will see more litigations on this
major issue that will, unfortunately, also extend to India in
due course. However, your Company's approach in forming
strategic alliances and partnerships in all overseas markets has
protected the Company from the high cost of patent
litigation."). The Court concludes that the exercise of
jurisdiction in the United States, and particularly in the
United States District Court for the Middle District of Georgia,
is reasonable and fair. In summary, the Court finds that in
November 2007, when this action was filed, Cipla had sufficient
contacts with the United States such that the exercise of
jurisdiction over Cipla in this country would not offend the
United States Constitution or laws.

10.

Based on the foregoing, Cipla was subject to the personal
jurisdiction of this Court under Rule 4(k)(2). Accordingly,
Cipla's motion to vacate the default judgment (ECF No. 33) is
denied.

## II. Violation of the Court's Order

11.

"The criteria for adjudicating a violation of a prohibition
against continued infringement by a party whose products have
already been adjudged to be infringing is a matter of Federal

Circuit law." *TiVo Inc. v. Echostar Corp.*, -- F.3d ----, 2011 WL 1486162, at *7 (Fed. Cir. Apr. 20, 2011) (en banc). "[T]he party seeking to enforce the injunction must prove both that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes." *Id.* "The patentee bears the burden of proving violation of the injunction by clear and convincing evidence, a burden that applies to both infringement and colorable differences." *Id.* at *8.

12.

The test for colorable difference is "one that requires determining whether substantial open issues with respect to infringement to be tried exist." *Id.* at *7 (internal quotation marks omitted). "[T]he contempt analysis must focus initially on the differences between the features relied upon to establish infringement and the modified features of the newly accused products." *Id.* The primary question is "whether the newly accused product is so different from the product previously found to infringe that it raises a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Id.* (internal quotation marks omitted). "The analysis must focus not on differences between randomly chosen features of the product found to infringe in the earlier infringement trial and the newly accused product, but on those aspects of the accused

product that were previously alleged to be, and were a basis for, the prior finding of infringement, and the modified features of the newly accused product." *Id.* (citations omitted).

13.

Validity of the patent and infringement of the original product are not open to challenge. *Additive Controls II*, 154 F.3d at 1350.

14.

PetArmor Plus is not more than colorably different from the product adjudged infringing the '329 Patent by the Court's March 6, 2008 Order. The product the Court found to be infringing in its previous order necessarily included the components and ingredients described in the claims of the '329 Patent which require: (1) synergistic effective amounts of fipronil; (2) synergistic amount of a compound which mimics juvenile hormones; and (3) at least one customary spot-on formulation adjuvant. PROTEKTOR PLUS contained 9.7% fipronil liquid and 11.8% methoprene and the percentages admittedly, by virtue of the default, existed in "synergistic" amounts. Moreover, PROTEKTOR PLUS necessarily—by virtue of the default— contained "at least one customary spot-on formulation adjuvant."

15.

Based upon the evidence presented, including the expert testimony presented by Merial, which the Court found persuasive, the PetArmor Plus product is not more than colorably different than the CIPLA PROTEKTOR PLUS product that the Court found infringes in the March 6, 2008 Order. They are essentially the same for purposes of this analysis. Both contain synergistic effective amounts of fipronil; a synergistic amount of a compound that mimics juvenile hormones (methoprene); and at least one spot-on adjuvant formulation that effectively delivers the active ingredients fipronil and methoprene. The Court further finds that the allegedly unique formulation of inactive ingredients in PetArmor Plus does not make it so different that it raises a fair ground of doubt as to the wrongfulness of Defendants' conduct.

16.

The Court concludes for purposes of the present action and pending motions that the PetArmor Plus product infringes the '329 Patent. For purposes of these proceedings, the validity of the '329 Patent is an established fact due to Cipla's default and the Court's finding in its previous order. Moreover, even if that fact were not established by default, no credible evidence has been presented to establish that the '329 Patent is not valid. Velcera's chief executive officer readily admitted at the hearing that if the '329 Patent is valid, then PetArmor

Plus violates that Patent. To corroborate that evidence, Merial's expert presented credible testimony that PetArmor Plus infringes Merial's '329 Patent. As explained above, PetArmor Plus for cats contains 9.8% fipronil and 11.8% methoprene, and PetArmor Plus for dogs contains 9.8% fipronil and 8.8% methoprene, which are the same as the percentages in Frontline Plus—Merial's product using the '329 Patent formulation. PetArmor Plus contains at least one customary spot on adjuvant. Velcera submitted "me too" applications with the EPA claiming PetArmor Plus is essentially the same as Frontline Plus. The Court concludes that PetArmor Plus continues to infringe the relevant claims of Merial's '329 Patent.

## III. Cipla's Contumacious Conduct

### 17.

To find a party specifically named in an injunction in contempt for violating the injunction, the Court must find by clear and convincing evidence that the party's conduct demonstrates that it knowingly and voluntarily violated the Court's Order. *Int'l Rectifier Corp.*, 361 F.3d at 1359.

### 18.

A finding of contempt of an injunction by infringement is determined using Federal Circuit law. *Id.*

### 19.

The injunction in this case permanently enjoined Cipla from:

> Committing any act that infringes or causes or induces infringement of any claim of the . . . '329 patent[], including but not limited to making, having made, using, causing to be used, selling, causing to be sold, offering for sale, and causing to be offered for sale in the United States, and importing and causing to be imported into the United States, any product that infringes any claim of the . . . '329 patent[][.]

Order ¶ e, March 6, 2008.

20.

It is clear that Cipla knew that it was prohibited from participating in the development and manufacture of any product for the treatment of ticks and fleas in dogs and cats containing the active ingredients fipronil and methoprene and inactive ingredients that acted as an adjuvant to deliver the active ingredients, which product it knew was being offered for sale in the United States, and which U.S. sales its conduct facilitated. It is likewise clear that Cipla knew that it was prohibited from participating in any venture that was designed to sell any product in the United States that violated Merial's '329 Patent. Merial established by clear and convincing evidence that Cipla knowingly manufactured PetArmor Plus, that it knew PetArmor Plus was to be sold in the United States, that PetArmor Plus violated Merial's '329 Patent, that PetArmor Plus was essentially identical to and not more than colorably different from the

infringing product described in the Court's March 6, 2008 Order, and that Cipla's role and participation in the sale of PetArmor Plus in the United States was indispensible and essential for the sale of the product in the United States. Thus, Cipla caused an infringing product to be sold in the United States, in direct violation of the Court's March 6, 2008 Order.

21.

Cipla relies on *International Rectifier Corp. v. Samsung Electronics Co., Ltd.*, 361 F.3d 1355 (Fed. Cir. 2004), to assert that it cannot be found in contempt because Cipla conducted no activity within the United States. Cipla argues that it cannot be held in contempt for actions of an unaffiliated entity that sells infringing products in the United States over which Cipla has no control. *International Rectifier Corp.* is distinguishable from this case. First, the defendant in *International Rectifier Corp.* delivered unfinished devices to a foreign non-party overseas, and the foreign non-party sold the products in the United States. The fabrication agreement between the defendant and the non-party pertained only to the manufacture of the devices outside of the United States. The agreement did not contemplate that the non-party could then import the products into the United States. Here, Cipla manufactured PetArmor Plus in market-ready condition explicitly for sale in the United States. Cipla sold PetArmor Plus to FidoPharm—a United States

38

company. Cipla's attempts to disguise the nature of the transactions by creating joint relationships for the purpose of selling PetArmor Plus to FidoPharm, a United States company, are unavailing. Cipla's contention that its conduct occurred wholly in India, completely unconnected to the United States, is not supported by the credible evidence in this case. Further, in *International Rectifier Corp.*, there was no evidence that the defendant participated in any activities of the non-party following the delivery of the unfinished products overseas. Although Cipla and Velcera attempted to create some distance between themselves by structuring their venture with several layers, the substance of their relationship is clear. Without Cipla, PetArmor Plus would not have been brought to market in the United States as it was. Their relationship was not merely that of an arms-length third party manufacturer. Cipla participated in the development, U.S. approval, and manufacture of the product. Moreover, even if Cipla was not literally the final seller of the product to the United States, it was an integral partner of the venture that sold the product to FidoPharm, such that Cipla caused the infringing product to be sold in the United States, which is prohibited by the 2008 Order.

22.

Cipla claims that the language in the Order enjoining Cipla from "causing" the products to be sold in the United States is

overbroad because it regulates Cipla's conduct outside of the United States. As previously explained, Cipla's conduct was in no way wholly unrelated to the United States. *See Forest Labs., Inc. v. Ivax Pharm., Inc.*, 501 F.3d 1263, 1272 (Fed. Cir. 2007) (rejecting argument similar to Cipla's that injunction impermissibly prohibited conduct outside of the United States where plan to manufacture, import, market and sell the infringing products "was undoubtedly a cooperative venture"). Moreover, although not the dispositive basis for the Court's findings or conclusions today, it is doubtful that Cipla can now contest the breadth of the 2008 Order given the fact that it allowed this action to fall into default.

## IV. Velcera's Contumacious Conduct

23.

An injunction order "binds only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." Fed. R. Civ. P. 65(d)(2)(A)-(C). It is undisputed that Velcera was not specifically named in the Court's March 6, 2008 Order.

24.

Velcera admits that it had actual knowledge of this Court's injunction against Cipla.

25.

A party who is not specifically named as a party to an injunction generally may not be found in contempt of that order. *See Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.,* 96 F.3d 1390, 1394 (Fed. Cir. 1996) [hereinafter *Additive Controls I*] (noting it is improper "for the district court 'to make punishable as a contempt the conduct of persons who act independently and whose rights have not been adjudged according to law." (quoting *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 436 (1934))). The Court, however, may hold the defendant in contempt and may hold in contempt "those identified with [the defendant] in interest, in 'privity' with [the defendant], represented by [the defendant] or subject to [the defendant's] control." *Regal Knitwear Co. v. Nat'l Labor Relations Bd.*, 324 U.S. 9, 14 (1945). "In essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Id.*

26.

It is clear that Velcera acted in concert with Cipla to violate the Court's March 6, 2008 Order. It knew that Cipla was

prevented from participating in the development and
manufacturing of a product to be sold in the United States that
violated Merial's '329 Patent.  Yet Velcera worked hand in hand
with Cipla to accomplish just that.  It cannot hide behind the
multilayered relationships designed to get the product to
market.  The substance of the arrangements clearly disclose that
there were two primary and essential parties in getting the
PetArmor Plus product to the U.S. Market—Velcera and Cipla.
Without Velcera's contributions to the enterprise, Cipla would
have been unable to violate the Court's Order.  Seduced by the
allure of future financial rewards, Velcera enabled Cipla to
participate in the development, manufacture, and sale of the
infringing product in the United States, knowing that its
conduct, combined with that of Cipla, violated the Court's
Order.

## V.    Permanent Injunction

### 27.

"According to well-established principles of equity, a
plaintiff seeking a permanent injunction must satisfy a four-
factor test before a court may grant such relief." *eBay Inc. v.
MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006).  "A plaintiff
must demonstrate: (1) that it has suffered an irreparable
injury; (2) that remedies available at law, such as monetary
damages, are inadequate to compensate for that injury; (3) that,

considering the balancing of the hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

The Court finds that Merial has demonstrated that it has suffered an irreparable injury. The introduction of a generic fipronil and methoprene product like PetArmor Plus will result in considerable loss of market share to Merial. Further, Velcera and Cipla's marketing strategy—specifically targeting Frontline Plus by touting PetArmor Plus as exactly like Frontline Plus only cheaper—makes the irreparable injury to Merial by the introduction of the product more obvious. The strategy for the packaging of PetArmor Plus to mimic the packaging of Frontline Plus will result in loss of brand recognition for Merial.

Velcera argues that Merial has not shown irreparable harm because Merial's expert allegedly concluded that the loss of market share would be about the same regardless of the number of generics that enter the market, and the existence of other generics that have already entered the market along with PetArmor Plus demonstrates that a permanent injunction would not prevent any injury to Merial. The Court does not find Velcera's argument persuasive. While the introduction of PetArmor Plus into the market may not account for the entire percentage of

eroded market share, that does not overcome the fact that PetArmor Plus is contributing to the erosion. The Court finds that the marketing strategy specifically targeting Frontline Plus, the lower cost of the PetArmor Plus product, and the branding of PetArmor Plus as nearly identical to Frontline Plus demonstrate that Velcera and Cipla's obvious goal is to erode Merial's market share. Based on the foregoing, the Court finds that Merial has suffered irreparable injury.

Merial has also demonstrated that there is not an adequate remedy at law. Losses in market share and brand recognition are difficult to quantify, and difficulty in estimating monetary damages is evidence that remedies at law are inadequate. *Broadcom Corp. v Qualcomm Inc.*, 543 F.3d 683, 703 (Fed. Cir. 2008).

The balance of hardships also favors permanent injunctive relief. Although Merial is a large global company, Frontline Plus is Merial's flagship product. Velcera attempts to paint a picture of itself as the proverbial David fighting for its economic survival against the Goliathan pharmaceutical bully Merial. While perhaps superficially appealing, the Court must resist sympathetic inclinations and remain moored to the law, which does not countenance favoring the legal Davids simply because they may be the underdog or disfavoring the Goliaths because they need less help. The law must treat them both as

equals; there is no size exemption from obeying lawful court orders. In this case, the law requires the Court to issue a ruling with potentially devastating economic consequences for Velcera. To fail to follow the law, however, and favor Velcera because of personal sympathy toward the plight of a fledgling company, would be exponentially more tragic.[10]

Finally, the Court finds that the public interest factor favors the granting of injunctive relief. Although the public may benefit from a lower priced fipronil/methoprene product if Cipla and Velcera were allowed to continue to violate the Court's Order and infringe on Merial's patent, the public is also served by enforced compliance with lawful court orders and the United States patent laws. Such compliance is necessary for the stability of a system that provides limited protection to individual creativity and inventiveness; thus allowing for the development of products that will benefit the public.

Based on the foregoing factors, the Court finds the following relief to be appropriate and necessary.

---

[10] As explained by the Federal Circuit, "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) (internal quotation marks omitted) (alteration in original).

RELIEF

1.

The Court orders seizure of any existing inventory in the United States of the products at issue manufactured by Cipla. The Court orders Cipla and Velcera to produce to Merial for destruction all inventory existing in the United States of any veterinary products manufactured by Cipla that contain fipronil and methoprene, including but not limited to the veterinary products that contain fipronil and methoprene sold under the brand names Protektor Plus, PetArmor Plus, TrustGard Plus, and Velcera Fipronil Plus. The parties shall file a joint report with the Court within sixty (60) days of today's Order describing the progress that has been made regarding compliance with this aspect of the Court's Order.

2.

The Court will conduct a hearing to determine an award to Merial for damages relating to all sales committed in violation of the Court's Order, including lost profits or a reasonable royalty for all sales. Within sixty (60) days of today's Order, Cipla and Velcera shall provide a written accounting of all sales of any veterinary product containing fipronil and methoprene manufactured by Cipla, or any of its subsidiaries or related companies, occurring after the date of the Court's March

6, 2008 Order, including, but not limited to, the products sold under the Protektor Plus, PetArmor Plus, TrustGard Plus, and Velcera Fipronil Plus brands.

3.

The Court will schedule a hearing to determine the amount of monetary sanctions, including attorney's fees and costs, that may be appropriate based upon Cipla's and Velcera's violation of this Court's Order.

4.

INJUNCTION

Based on the foregoing, the Court orders the following:

Cipla, as well as those in active concert with it who have notice of this Order, are herewith permanently enjoined from making, having made, using, causing to be used, selling, causing to be sold, offering for sale, and causing to be offered for sale in the United States and importing and causing to be imported into the United States veterinary products that contain fipronil and methoprene, regardless of brand name, including but not limited to the veterinary products that contain fipronil and methoprene denominated Protektor Plus, PetArmor Plus, TrustGard Plus, and Velcera Fipronil Plus.

Velcera is herewith permanently enjoined from selling, causing to be sold, offering for sale, and causing to be offered for sale in the United States veterinary products for which Cipla participated in the development, manufacture, and/or packaging, which products contain fipronil and methoprene, regardless of brand name, including but not limited to the

veterinary products Protektor Plus, PetArmor Plus, TrustGard Plus, and Velcera Fipronil Plus.[11]

FINAL JUDGMENT AND TEMPORARY STAY

To facilitate an immediate appeal of this Order, the Court directs that final judgment shall be entered pursuant to Fed. R. Civ. P. 54(b) as to the claims decided in today's Order. The Court finds that there is no just reason for delay.

Given the potential immediate and serious impact of this Order on Cipla and Velcera and the Court's desire that they have an opportunity for meaningful review, the Court stays the enforcement of this Order for sixty (60) days from the entry of it.

IT IS SO ORDERED, this 21st day of June, 2011.

S/Clay D. Land

CLAY D. LAND
UNITED STATES DISTRICT JUDGE

---

[11] The Court intends to limit the specific injunctive relief against Velcera to its conduct in concert with Cipla. *See Additive Controls I,* 96 F.3d at 1395-96.