UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| BASF AGRO B.V., MERIAL LIMITED and MERIAL SAS<br><br>　　　　Plaintiffs,<br><br>v.<br><br>CIPLA LIMITED, *et al.*<br><br>　　　　Defendants<br><br>and<br><br>VELCERA, INC. and FIDOPHARM, INC.,<br><br>　　　　Intervenors. | Case No. 3:07-CV-00125-CDL |

**INTERVENORS VELCERA, INC.'S AND FIDOPHARM, INC.'S
BRIEF IN SUPPORT OF THEIR EMERGENCY MOTION TO STAY
DAMAGES PROCEEDINGS PENDING APPEAL OR
IN THE ALTERNATIVE FOR AN EXTENSION OF
THE DISCOVERY PERIOD**

## I.  INTRODUCTION

On January 11, 2012, the U.S. Court of Appeals for the Federal

Circuit will hear oral argument in the appeals of this Court's June 21, 2011

contempt ruling (DE 75) (the "Contempt Order").  Between now and the

conclusion of the appeals, the parties in this case will conduct numerous fact

depositions, exchange expert reports, take and defend expert depositions,

litigate at least several discovery-related motions, brief and argue dispositive motions, and prepare for and perhaps complete a bench trial.  Along the way, each party will likely incur additional legal fees and expenses approaching, if not exceeding, $1 million.  Simultaneously, Intervenors Velcera, Inc. and FidoPharm, Inc. (collectively "Velcera") will be defending against a new trade dress infringement lawsuit and preliminary injunction motion filed in this Court by Merial, Ltd. and Merial SAS ("Merial").

Under these circumstances, an equitable stay of this case pending the completion of the Federal Circuit appeal is warranted.  District courts have broad discretion to stay proceedings in the interest of conserving judicial and party resources, and in the patent context, there is a strong policy in favor of resolving liability appeals before damages are assessed.  Here, the imminent outcome of the appeals could entirely moot the ongoing damages proceedings.  With the appellate argument just seven weeks away, it makes no sense for the parties to continue to engage in costly (and rapidly escalating) litigation on damages issues, or for the Court to devote substantial resources to deciding motions and conducting a trial. Accordingly, Velcera respectfully requests that the Court stay the damages and sanctions phase of this case pending resolution of Velcera's appeal.  In the alternative, Velcera respectfully requests that the Court extend the

discovery period in the damages phase of this proceeding until sixty (60)

days after the Court rules on Velcera's pending Motion to Compel (DE 121).

## II. <u>PROCEDURAL AND FACTUAL BACKGROUND</u>

In the Contempt Order, the Court ordered the seizure and destruction

of certain fipronil and s-methoprene containing products manufactured by

Defendant Cipla Limited ("Cipla"), permanently enjoined Velcera from

selling any such products in the United States, and indicated that it would

"conduct a hearing to determine an award to Merial for damages relating to

all sales committed in violation of the Court's [prior injunction against

Cipla], including lost profits or a reasonable royalty for all sales."

(Contempt Order at 46-48.)  To "facilitate an immediate appeal" of the

Order, the Court directed that a final judgment be entered pursuant to Rule

54(b) of the Federal Rules of Civil Procedure.  (*Id.* at 48).  In addition, citing

"the potential immediate and serious impact of this Order on Cipla and

Velcera and the Court's desire that they have an opportunity for meaningful

review," the Court stayed enforcement of the Order for sixty (60) days.

(*Id.*).

On June 23, 2011, Velcera appealed the Contempt Order and

Judgment to the Federal Circuit.  (DE 80).  On the same day, Velcera moved

this Court pursuant to Fed. R. Civ. P. 62(c) and Fed. R. App. P. 8(a)(1) to

3

extend the temporary stay pending review by the Federal Circuit.  (DE 79).

On June 30, 2011, the Court denied Velcera's motion.  (DE 89).  Velcera

then sought a stay of the Contempt Order and Judgment from the Federal

Circuit.  (*See* Appellants' Emergency Mot. to Stay Contempt Order and Inj.

Pending Appeal (*Merial Ltd. v. Velcera, Inc..*, Case Nos. 2011-1471, -1472

(Fed. Cir.) ("Fed. Cir. Appeal"), DE 31).)  The Federal Circuit granted

Velcera's motion in part and ordered that the portion of the Contempt Order

requiring the destruction of inventory be stayed during the pendency of the

appeal.  (*See* Order dated August 17, 2011 (Fed. Cir. Appeal, DE 47).)[1]

The parties proceeded with merits briefing on the appeals, and on

November 21, 2011, the Federal Circuit issued an order scheduling the oral

argument for January 11, 2012.  (Ex. A).

On October 3, 2011, this Court entered the damages and sanctions

phase scheduling order proposed by the parties (the "Scheduling Order")

(DE 111).  Under the current schedule, less than five weeks was allotted for

---

[1] In the current Motion, Velcera does not seek to relitigate its previous request for a stay.  To the contrary, Velcera has fully complied with the injunction by ceasing all sales of PetArmor® Plus and by isolating all remaining inventory to prevent any further sale or distribution.  Instead, Velcera seeks a stay  pursuant to settled case law that supports deferring damages proceedings related to a pending liability appeal under a prudential standard that is different and easier to meet than the standard governing Velcera's previous request to stay the Judgment pending appeal.  (*See* Part III(A) *infra*)).

4

depositions of fact witnesses, and the period for taking such depositions closes on December 9, 2011.  Expert discovery commences thereafter and closes on January 20, 2012.  Considering the complex and significant damages issues facing the parties[2], the current schedule is extremely aggressive and presupposes that the parties will not require court intervention.   Unfortunately, Merial has engaged in multiple abuses of the discovery process in this action, forcing Velcera to file a motion to compel highly relevant documents from Merial (DE 121) and a motion for a protective order because of Merial's admitted violations of Local Rule 34 (DE 122).  In addition, Merial has filed in another court a motion to quash a third-party subpoena served by Velcera.  Merial's unwillingness to comply with its discovery obligations, and its efforts to obstruct Velcera's efforts to obtain relevant discovery elsewhere, have placed the entire discovery

---

[2]  *See Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1447 (Fed. Cir. 1990) ("We recognize that an assessment of a royalty based on a fictional negotiation is not a simple task. 'Determining a fair and reasonable royalty is often, . . . a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge.'") (citation omitted).  As Judge Learned Hand put it, "the whole notion of a reasonable royalty is a device in aid of justice, by which that which is really incalculable shall be approximated." *Cincinnati Car Co. v. N.Y. Rapid Transit Corp.*, 66 F.2d 592, 595 (2d Cir. 1933).  *See also Georgia-Pacific Corp. v. U.S. Plywood Corp.,* 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (setting forth fifteen non-exclusive factors to be considered in reasonable royalty analysis).  Therefore, conducting a reasonable royalty analysis in this case will be challenging and complicated, especially if the proceedings are conducted in a highly compressed time period.

schedule in serious jeopardy.   Simply put, Velcera cannot defend against Merial's claims without the discovery being withheld by Merial.

Another important factor impacting the current schedule is Merial's recent Complaint against Velcera alleging, among other things, trade dress infringement based on the packaging of Velcera's PetArmor® (fipronil-only) product.  *See Merial Limited  v. Velcera, Inc. et al.*, 3:11-cv-00157-CDL.  On November 18, 2011, before Velcera had any opportunity to respond to the Complaint, Merial filed a motion for a preliminary injunction. The Court recently set a hearing date on Merial's request for preliminary injunction for December 5, 2011, which falls squarely in the middle of discovery in the damages and sanctions phase of this case.

Merial **never** disclosed its plans to bring the trade dress action during the negotiations between the parties regarding an appropriate discovery schedule for the damages phase of this litigation.  Considering that Velcera's PetArmor® product has been on the market for **over seven months**, it is apparent that the timing of Merial's Complaint and request for preliminary injunctive relief was deliberately calculated to prejudice Velcera by diverting its attention and resources during the expedited damages and sanctions phase of this litigation.  By effectively setting up two complex and potentially "life threatening" litigation matters on one "fast track," Merial

seeks to deprive Velcera of a full and fair opportunity to defend itself in either case.

### III.   ARGUMENT AND CITATION OF AUTHORITY

**A. Federal Courts and Congress Have Expressed a Strong Policy Favoring the Resolution of Liability Appeals in Patent Cases Before Damages Are Assessed**

It is axiomatic that a federal court has broad discretion to stay proceedings in the interests of "economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936); *accord Coast Fed. Bank, FSB v. United States*, 49 Fed. Cl. 11, 15 (2001). The common sense principle underlying the exercise of this authority is that, in some circumstances, it simply does not make sense to undertake costly proceedings on matters that could be mooted by resolution of an issue on appeal. *See id.* This principle is reflected in the general equitable standard for staying damages proceedings pending appeal— a standard that is different, and easier to meet, than the standard for staying execution of a judgment pending appeal. *Compare Coast Fed. Bank*, 49 Fed. Cl. at 15 (holding that precedents concerning "stay[s] of the court's judgment pending appeal" were "inapposite" regarding motion for stay of damages proceedings) *with* Order of June 30, 2011 (DE 89) (addressing factors for staying execution of judgment pending appeal); *Isaly Co. v.*

*Kraft, Inc.*, 622 F. Supp. 62, 62 (M.D. Fla. 1985) (staying damages proceedings pending appeal notwithstanding trial judge's statement that, "[h]aving decided for Plaintiff on the facts and the law, I am obviously not disposed to find that the Defendant now enjoys a likelihood of success on the appeal").

In the context of patent related litigation, settled precedents reflect a strong policy favoring the resolution of liability appeals before damages are assessed. *See, e.g., Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1580 (Fed. Cir. 1994) (emphasizing that appellate resolution of liability question would "avoid a burdensome determination of damages").[3]  Indeed, as the Federal Circuit has observed, Congress enacted some subsections of 28 U.S.C. § 1292, which would have allowed interlocutory appeal of the Court's contempt judgment and injunction absent the Court's Rule 54(b) certification, specifically to "permit a stay of a damages trial" pending

---

[3]  *See also ION, Inc. v. Sercel, Inc.*, No. 5:06-CV-236, 2011 WL 537858, at *1-2 (E.D. Tex. Feb. 16, 2011) (staying proceedings on supplemental damages claims in patent case pending resolution of appeal); *cf. Std. Havens Prods., Inc. v. Gencor Indus., Inc.*, 996 F.2d 1236 (tbl.), No. 93-1208, 1993 WL 172432, at *1 (Fed. Cir. May 21, 1993) (directing district court to stay damages proceedings pending final decision in reexamination); *Schlegel Mfg. Co. v. King Aluminum Corp.*, 381 F. Supp. 649, 654-55 (S.D. Ohio 1974), *aff'd*, 525 F.2d 775 (6th Cir. 1975) (ordering stay of damages accounting pending appeal of contempt order resulting from violation of injunction against patent infringement).

appeal of liability issues and other issues in infringement actions. *In re Calmar, Inc.*, 854 F.2d 461, 464 (Fed. Cir. 1988); *accord SRI Int'l, Inc. v. Adv. Tech. Labs., Inc.*, 45 F.3d 443, No. 93-1074, 1994 WL 712487, at *1 (Fed. Cir. Dec. 21, 1994) ("The purpose and rationale of § 1292(c)(2)—to permit a district court to stay a damages trial pending the outcome of an appeal on the merits—has been clearly stated by both Congress and the Supreme Court.  This court has heard those clear statements.").  All of these cases, no matter which subsection of Section 1292 they address, stand for the general proposition that expensive and time-consuming damages determinations in patent cases should be deferred where a pending appeal could "vitiate the [] proceedings below."  *E.g., Coast Fed. Bank*, 49 Fed. Cl. at 15 (internal quotation marks and citation omitted).

In the current case, there is no question that Velcera's appeal of the Contempt Order and Judgment could moot the need for any damages proceeding.  As history has already shown, an analysis of the damages issues in this case will be time consuming, complex and expensive.  Moreover, Merial's initiation of yet another litigation matter against Velcera in which it similarly seeks "expedited" relief further compounds the difficulties currently faced in administering these cases.   Therefore, it makes sense to stay the damages proceedings in this case pending the Federal Circuit's

imminent review of the Contempt Order and Judgment entered by this

Court.

**B. The Damages Proceedings Will Involve Significant Discovery and Expert Analysis Regarding Complex Market, Product and Financial Issues**

Merial and intends to seek a reasonable royalty and disgorgement of

any profits Velcera earned on the sale of its PetArmor® Plus product.  (*See*

Scheduling Order (DE 111).)  Merial's approach  to the damages phase of

this proceeding presents numerous legal and factual issues whose resolution

will burden not just the litigants, but also the Court and third parties.

Establishing a reasonable royalty requires the parties to take discovery

regarding a variety of issues, including, but not limited to, the structure of

the relevant market, the effect of distinct market channels on calculating any

reasonable royalty, the identity and acceptability of a variety of non-

infringing substitutes to Merial's Frontline® Plus product, and financial

information regarding the parties' respective sales, costs and profit margins.

**1. Determination of a Reasonable Royalty Involves Contested Legal Issues and Complex Discovery**

The prevalent method of determining an appropriate reasonable

royalty involves the determination of "a hypothetical royalty resulting from

arm's length negotiation between a willing licensor and a willing licensee."

*Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir.

1983).  This hypothetical negotiation takes place at the time the infringement

began.  *Id.*  The analysis "necessarily involves some approximation of the

market as it would have hypothetically developed absent infringement," but

also "requires sound economic and factual predicates."  *Riles v. Shell*

*Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).

A reasonable royalty rate can take many forms, including a lump sum,

a per unit amount, a percentage of sales, or a combination of such methods.

*See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384

(Fed. Cir. 2001) (recognizing lump sum payments); *Wright v. United States*,

53 Fed. Cl. 466, 478 (2002) (combined lump sum and running royalty).

Although the patent laws do not mandate any particular method to

determine a reasonable royalty, courts generally consider the following

fifteen, non-exclusive factors set forth in *Georgia-Pacific Corp. v. U.S.*

*Plywood Corp.,* 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970):

> 1.      The royalties received by the patentee for the licensing of the
> patent in suit, proving or tending to prove an established royalty.
>
> 2.      The rates paid by the licensee for the use of other patents
> comparable to the patent in suit.
>
> 3.      The nature and scope of the license, as exclusive or non-
> exclusive; or as restricted or non-restricted in terms of territory or
> with respect to whom the manufactured product may be sold.
>
> 4.      The licensor's established policy and marketing program to
> maintain his patent monopoly by not licensing others to use the

invention or by granting licenses under special conditions designed to preserve that monopoly.

5.      The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6.      The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7.      The duration of the patent and the term of the license.

8.      The established profitability of the product made under the patent; its commercial success; and its current popularity.

9.      The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10.     The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11.     The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12.     The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.     The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.     The opinion testimony of qualified experts.

15.     The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

318 F. Supp. at 1120. Analysis of each of these factors in this case requires significant document and deposition discovery from all parties and third parties, as well as extensive expert reports and depositions.

## 2.  Examples of Discovery and Information Needed

Merial's decision to abandon any claim for lost profits has not eliminated the need for discovery into its products' profitability for purposes of determining a reasonable royalty.   Indeed, *Georgia-Pacific* Factor 8 specifically calls for consideration of the "established profitability" of Merial's product.  *See also See Rite-Hite Corp. v. Kelley Co.*, Inc., 56 F.3d 1538, 1554-55 (Fed. Cir. 1995) (acknowledging propriety of considering patentee's profit margin in determining "reasonable royalty").  In addition, Velcera's profit margin may also be factored into the reasonable royalty analysis.  *See Hughes Tool Co. v. Dresser Indus. Inc.*, 816 F.2d 1549, 1556-58 (Fed. Cir. 1987) (considering propriety of reasonable royalty award in light of infringer's profit margin).

13

While each side may ultimately argue for different weights to be attributed to each other's profits, discovery of the profit information remains necessary. Such information includes documentation of revenues and cost structures (e.g., overhead, marketing expenses and manufacturing investments). *See Caterpillar, Inc. v. Detroit Diesel Corp.*, Civil Action No. 3:95CV489RM, 1997 WL 33165848, *4-5 (N.D. Ind. Jan. 24, 1997) (holding that "sales, marketing, cost, and profit information" was discoverable because "the profitability, cost, and sales of a product are factors which are considered in determining a reasonable royalty . . . .") (citations omitted). Further, because the cost structures of companies are unique, understanding the profit analysis requires consultation with damages experts following receipt of company information available only through written discovery and deposition testimony.

The same is true with respect to *Georgia Pacific* Factor 5, which relates to the competitive positioning of the parties. This case does not present the classic damages scenario where the parties agree that their products compete for the same customers in the same sales channels. Instead, the opposite is true – Merial purports to eschew the <u>only</u> channel where PetArmor™ Plus is sold (at retail) in favor of a veterinary channel of distribution. Specifically, according to Merial's various public statements

14

on the subject, Merial only sells its Frontline® Plus product through exclusive relationships with veterinarians.  In contrast, Velcera sold its PetArmor® Plus product only through retail channels (Wal-Mart and Sam's Club, specifically).  Due to this market segmentation, it is necessary for the parties to take discovery regarding these distinct channels of distribution in the course of attempting to "approximat[e] the market as it have hypothetically developed absent the [alleged] infringement."  *Georgia Pacific*, 298 F.3d at 1311.  Information  needed on this issue includes analysis and forecasts of each of these distinct markets; Merial's policies and enforcement of its veterinarian-only distribution; Merial's own basis for establishing and maintaining this restriction; and collection of evidence of the actual effect of the entry into the over-the-counter market of Velcera. This information is likely to show that the existence of market segmentation resulted in little or no impact of the alleged infringement on Merial's ongoing sales, and thus may be a significant factor in determining the hypothetical royalty to which Velcera and Merial would have agreed.

Related to the question of market segmentation is also price segmentation.  The price of Velcera's product is significantly lower than Merial's product.  Accordingly, investigation into the effect of price on a consumer's decision to purchase, in combination with the availability of the

15

product over-the-counter versus only through a veterinarian, is highly

relevant to the reasonable royalty analysis.  This requires discovery into each

party's pricing models, and Merial's historical information relating to price.

Another significant area of discovery and analysis is *Georgia-Pacific*

Factor 9, which relates to the consideration on non-infringing substitutes to

the patented invention.  Here, there were a number of non-infringing

alternatives available for Velcera to sell during the period of Velcera's

alleged infringement, including Velcera's own fipronil-only product.  The

fact that Velcera could have marketed one of these alternative products or

formulations during the alleged period of infringement instead of taking a

hypothetical license from Merial is highly relevant to the determination of a

reasonable royalty, since it provides an option to enter the market without

any need to pay royalties.  *See Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563,

1571-72 (Fed. Cir. 1996) (approving consideration of availability of

noninfringing device in determining reasonable royalty).  To properly assess

this factor, it is necessary to take discovery from Merial and third parties

regarding the availability of non-infringing formulations and products that

are acceptable substitutes for Merial's Frontline® Plus product.  *See id.*

In addition to these particular issues that make the damages questions

in this case more complex than in the typical reasonably royalty scenario,

discovery regarding the following categories of information will also be required:

- specific licensing or licensing negotiations relating to the '329 patent, or other patents and products in the same field;

- settlement of any infringement claims under the '329 patent;

- Market strategies and analyses of market share;

- Advertising strategies and materials;

- Periodic sales data categorized by geographic area; and

- Forecasts and planning documents relating to anticipated sales; and

- license rates and terms in the industry.

*See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1314-15 (Fed. Cir. 2011) (rejecting "rule of thumb" for establishing reasonable royalty and requiring that reasonable royalty be tied to the facts of the case); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872-873 (Fed. Cir. 2010) (explaining relevance of licenses and settlements to reasonable royalty calculation). The collection and processing of this information requires substantial effort, as will the continued review of documents and information that are produced by the parties and third parties.

**C. Merial's Refusal to Provide Any Meaningful Discovery in this Action Renders Velcera's Ability to Complete Discovery Within the Current Schedule a Practical Impossibility**

As reflected in Velcera's Motion to Compel (DE 121), Merial has obstructed Velcera's efforts to take discovery regarding the various issues discussed above at virtually every turn.  By engaging in such a "scorched earth" approach to discovery, Merial has effectively prevented Velcera from completing the discovery it needs to defend against Merial's claims within the schedule set by the Court.  Therefore, in the alternative to Velcera's request for a stay of these proceedings, Velcera respectfully requests that the Court extend the current fact discovery period until sixty (60) days following a ruling on Velcera's Motion to Compel and stay any further deadlines set in the Scheduling Order until further notice.

## IV.  CONCLUSION

Under the circumstances of this case, established Supreme Court and Federal Circuit precedent counsel in favor of a stay of any damages proceedings for the limited amount of additional time that it will take for the Federal Circuit to complete its review of Velcera's appeal.  The Federal Circuit's decision could very well vitiate the damages proceedings in this case.  Therefore, Velcera respectfully requests that the Court grant its request for a stay of the damages proceedings in this matter pending the resolution of Velcera's appeal.

Respectfully submitted this 23rd day of November, 2011.

18

/s/ Tryn T. Stimart
**COOLEY LLP**
Jonathan G. Graves (of counsel)
Va. Bar No.: 46136
Phillip E. Morton (of counsel)
Va. Bar No.: 71299
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, Virginia 20190
Telephone: (703) 456-8000
Facsimile: (703) 456-8100

Tryn T. Stimart (of counsel)
DC Bar No.: 498475
777 6th Street NW, Suite 1100
Washington, DC 20001
Telephone: (202) 842-7800
Facsimile: (202) 842-7899

**WARGO & FRENCH LLP**
Michael S. French, Esq.
Georgia Bar No. 276680
mfrench@wargofrench.com
999 Peachtree Street, NE
26th Floor
Atlanta, Georgia  30309
(404) 853-1500

**PAGE, SCRANTOM, SPROUSE, TUCKER & FORD, P.C.**

William L. Tucker
Ga. Bar No.: 718050
James C. Clark, Jr.
Ga. Bar No.: 127145
Thomas F. Gristina
Ga. Bar No.: 452454
Kirsten C. Stevenson
Ga. Bar No.: 801101

19

1111 Bay Avenue, Third Floor
Columbus, Georgia 31901
(706) 324-0251


*Attorneys for Intervenors Velcera,
Inc. and FidoPharm, Inc.*

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| BASF AGRO B.V., MERIAL LIMITED and MERIAL SAS<br><br>        Plaintiffs,<br><br>v.<br><br>CIPLA LIMITED, *et al.*<br><br>        Defendants<br><br>and<br><br>VELCERA, INC. and FIDOPHARM, INC.,<br><br>        Intervenors. | Case No. 3:07-CV-00125-CDL |

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of November, 2011, I electronically filed the foregoing Intervenors Velcera, Inc.'s and FidoPharm, Inc.'s Brief in Support of Emergency Motion to Stay Damages Proceedings Pending Appeal or in the Alternative for an Extension of the Discovery Period.  I also certify that the foregoing document is being served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

21

/s/ Tryn T. Stimart
**COOLEY LLP**
DC Bar No.: 498475
777 6th Street NW, Suite 1100
Washington, DC 20001
Telephone: (202) 842-7800
Facsimile: (202) 842-7899

*Attorneys for Intervenors*
*Velcera, Inc. and FidoPharm,*
*Inc.*