# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

ATHENS DIVISION

```
BASF AGRO B.V.; MERIAL LIMITED;   )
and MERIAL SAS,                   )
                                  )
        Plaintiffs,               )
                                  )
vs.                               )
                                  )
CIPLA LIMITED; PETMEDS R US;      ) CIVIL ACTION NO.
GENERIC PETMEDS; PETCARE          ) 3:07-CV-00125
PHARMACY; ARCHIPELAGO SUPPLIERS;  )
ARROWTARGET ENTERPRISES, LTD;     ) MAY 17, 2011
INHOUSE DRUGSTORE; and LISA       )
PERKO,                            ) MOTION HEARING
                                  )
        Defendants,               ) VOLUME II OF II
                                  )
and                               )
                                  )
VELCERA, INC., and FIDOPHARM,     )
INC.                              )
                                  )
        Intervenors.              )
```

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CLAY D. LAND,

UNITED STATES DISTRICT JUDGE

Proceedings recorded by mechanical stenography; transcript produced by computer.

BETSY J. PETERSON, RPR, CCR
Federal Official Court Reporter
Post Office Box 81
Columbus, Georgia  31902
(706) 317-3111

```
 1                        APPEARANCES

 2

 3   FOR THE PLAINTIFFS:

 4       EDWARD DONALD TOLLEY
         etolley@mindspring.com
 5       Cook, Noell, Tolley & Bates LLP
         304 East Washington Street
 6       Post Office Box 1927
         Athens, GA 30603
 7       (706) 549-6111

 8       FRANK G. SMITH, III
         fsmith@alston.com
 9       JOHN WILLIAM COX
         john.cox@alston.com
10       MATTHEW WOLFF HOWELL
         matthew.howell@alston.com
11       Alston & Bird, LLP
         One Atlantic Center
12       1201 West Peachtree Street
         Atlanta, Georgia  30309-3424
13       (404) 881-7000

14       J. PATRICK ELSEVIER
         jpelsevier@jonesday.com
15       Jones Day
         12265 El Camino Real
16       Suite 200
         San Diego, California  92130-4096
17       (858) 314-1200

18       JUDY JARECKI-BLACK
         judy.jarecki@merial.com
19       Merial Limited
         3239 Satellite Boulevard
20       Duluth, Georgia  30096
         (678) 427-2048
21

22

23

24

25
```

```
 1   FOR THE DEFENDANTS:

 2        NEAL J. CALLAHAN
          njc@waldrepmullin.com
 3        Waldrep, Mullin & Callahan, LLC
          P.O. Box 351
 4        105 Thirteenth Street
          Suite B
 5        Columbus, Georgia   31902-0351
          (706) 320-0600
 6
          ROBERT B. BREISBLATT
 7        robert.breisblatt@kattenlaw.com
          Katten Muchin Rosenman LLP
 8        525 West Monroe Street
          Chicago, Illinois   60661-3693
 9        (312) 902-5480

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   FOR THE INTERVENORS:

 2       WILLIAM L. TUCKER
         wlt@psstf.com
 3       Page, Scrantom, Sprouse, Tucker & Ford, P.C.
         Attorneys and Counselors at Law
 4       1111 Bay Avenue, Third Floor
         Post Office Box 1199
 5       Columbus, Georgia  31901
         (706) 324-0251
 6
         JONATHON G. GRAVES
 7       jgraves@cooley.com
         Cooley LLP
 8       One Freedom Square
         Reston Town Center
 9       11951 Freedom Drive
         Reston, Virginia  20190-5656
10       (703) 456-8100

11       TRYN T. STIMART
         tstimart@cooley.com
12       Cooley LLP
         777 6th Street NW
13       Suite 1100
         Washington, DC  20001
14       (202) 842-7800

15   Also Present:

16       Dennis Steadman, representing Velcera, Inc.

17

18

19

20

21   COURT REPORTER:

22       BETSY J. PETERSON, RPR, CCR
         Federal Official Court Reporter
23       P. O. Box 81
         Columbus, GA 31902
24       (706) 317-3111

25
```

1                    EXAMINATION INDEX

2    PLAINTIFFS' EVIDENCE (CONTINUED)

3    ANNA CAMPBELL, Ph.D.
         DIRECT BY MR. ELSEVIER                        8
4        CROSS BY MR. BREISBLATT                      20
         CROSS BY MR. STIMART                         22
5
     LEONORE WITCHEY-LAKSHMANAN, Ph.D.
6        DIRECT BY MR. ELSEVIER                       35
         CROSS BY MR. BREISBLATT                      67
7        CROSS BY MR. STIMART                         78
         REDIRECT BY MR. ELSEVIER                    122
8        RECROSS BY MR. BREISBLATT                   135
         RECROSS BY MR. STIMART                      142
9
     JESSICA COBBS
10       DIRECT BY MR. TOLLEY                        155
         CROSS BY MR. BREISBLATT                     161
11       CROSS BY MR. GRAVES                         180
         REDIRECT BY MR. TOLLEY                      182
12
     MATTHEW HOWELL
13       DIRECT BY MR. TOLLEY                        187
         CROSS BY MR. CALLAHAN                       240
14       REDIRECT BY MR. TOLLEY                      250
         RECROSS BY MR. CALLAHAN                     250
15
     DENNIS STEADMAN
16       CROSS BY MR. SMITH                          257
         DIRECT BY MR. GRAVES                        329
17       DIRECT BY MR. BREISBLATT                    343
         RECROSS BY MR. SMITH                        345
18

19

20

21

22

23

24

25

BETSY J. PETERSON, RPR, CCR
Federal Official Court Reporter
Post Office Box 81
Columbus, Georgia  31902
(706) 317-3111

```
 1  until you get finished.  All right?
 2           THE WITNESS:  Yes, sir.
 3           THE COURT:  Okay.  We'll be in recess for at least 15
 4  minutes.
 5       (Recess taken for another matter to be hear.)
 6           THE COURT:  Be seated.
 7           Okay.  Let's resume with Mr. Stimart's
 8  cross-examination of the witness.
 9           MR. STIMART:  Thank you, Your Honor.
10  BY MR. STIMART:
11  Q.  Doctor, on direct examination, do you recall counsel asking
12  you about various properties that inert ingredients might have
13  on the formulation?
14  A.  If by "properties" you mean "functions," yes.
15  Q.  "Functions" is fine.  And let's go through that list and
16  correct me -- tell me if I got this correctly or if I'm missing
17  one or added something to it.
18       I believe you mentioned efficacy?
19  A.  Not -- I'm sorry, I'm...
20  Q.  Could an inactive ingredient impact efficacy of a
21  formulation with a pesticide?
22  A.  It could assist the active ingredient to be available to be
23  efficacious, if that's what you mean.
24  Q.  So it could affect efficacy.
25  A.  Of the active ingredient.
```

```
 1  Q.  Right.  That's my question.  You agree with that?
 2  A.  I would agree with that in general.
 3  Q.  It could also affect dissolution of the formulation;
 4  correct?
 5  A.  Yes, it could.  You need to choose your formulations
 6  judiciously to allow the product to be efficacious.
 7  Q.  It could also affect penetration of the active ingredient
 8  onto the -- onto the animal, for example?
 9  A.  Depending on the product that you're developing, you would
10  perhaps consider a penetration enhancer, yes.
11  Q.  You also mentioned delivery.  Is that is -- were you -- is
12  delivery the same thing?
13  A.  Delivery is a broader term.  The application, the actual
14  administration for the product, depending on what its need is,
15  yeah.
16  Q.  And I believe you also mentioned metabolism.  Is that
17  right?
18  A.  Yes.
19  Q.  What about aesthetics?  Is the aesthetic quality of a
20  formulation also something that could be impacted by the inert
21  or inactive ingredients?
22  A.  Yes.
23  Q.  And by aesthetics, for example, odor.  You don't want
24  something that --
25  A.  It could be odor.
```

```
 1  Q.  I'm sorry.  I didn't mean to interrupt you.
 2  A.  Yes, it could be odor.
 3  Q.  You don't want a product on the back of an animal -- a cat,
 4  a dog, whatever it might be -- to smell, to be a bad-smelling
 5  product.
 6  A.  An offensive smell may not -- may be something that you're
 7  not particularly interested in, yes.
 8  Q.  And also in terms of aesthetics, you don't want to have the
 9  hair on the dog or the cat, for example, to be clumpy and
10  matty; right?
11  A.  You would prefer it not be, yes.
12  Q.  That's an aesthetic quality?
13  A.  It would be considered part of the aesthetics of the
14  product.
15  Q.  And just so I understand, the -- what you put in, aside
16  from the active ingredients, could impact that; correct?
17  A.  It could.
18  Q.  And I think you just said, in one of your answers, that
19  it's important to judiciously pick the inactive ingredients for
20  a formulation.  Is that right?
21  A.  Yes, that's correct.
22  Q.  So a lot of time and thought and energy go into that, on
23  what should be picked for a formulation.
24  A.  It may.
25  Q.  Have you done that, formulation picking inactive
```

1  substantially similar or identical to the FRONTLINE products so
2  that you could accelerate the EPA regulatory approval process;
3  right?
4  A.  Exactly.
5  Q.  Thank you.
6      Now, let's take a look at paragraph 19 of your
7  declaration.
8      Now, here you say that "Commercial manufacture of PetArmor
9  Plus began one month after EPA approval was issued."  That
10 would have been in February of this year?
11 A.  That's correct.
12 Q.  First import was March 2011?
13 A.  That's correct.
14 Q.  First retail availability, April 11, 2011?
15 A.  Week of April 11, yeah.
16 Q.  Those products are currently available in Georgia.  Are
17 they not, sir?
18 A.  Yes, they are, as far as I know, yeah, unless they're out
19 of stock.
20 Q.  And at the time you went commercial, if you will, with the
21 PetArmor Plus products, you were aware of this Court's
22 injunction, were you not?
23 A.  Yes, we were.
24 Q.  You were aware of the 329 patent, were you not?
25 A.  Yes, we were.

```
 1   Q.  You did not at any point in time ever approach the Court to
 2   ask for any interpretation or relief from the order, did you,
 3   sir?
 4   A.  No, we did not.
 5           THE COURT:  What did you —
 6   A.  We had an assessment —
 7           THE COURT:  What did you think the order meant?  Did
 8   you think it meant that — why did you think y'all were in the
 9   clear as far as the order was concerned?  Is it that you
10   just — you let your lawyers look at it and they gave you that
11   advice or —
12           THE WITNESS:  Well, they —
13           THE COURT:  I don't want you to tell me specifically
14   what they said, but you made a conscious decision at some point
15   that this product was not contrary to the Court's order, was
16   not enjoined by the Court's order.  Was that just that you
17   turned it over to your lawyers and said, "Can we proceed"?
18           THE WITNESS:  Well, we did seek our lawyers' input
19   and counsel, certainly.  It was my understanding that we did
20   not — we were not a subject of this injunction.  And I've
21   already said that we did not need to respect the 329 patent
22   because of its invalidity in our eyes and that the manufacture
23   of this product to our specifications, customized in particular
24   to us, in India and sold in India, was not necessarily a
25   violation of the 329 patent, as I understand the law.  And so
```